IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MELISA SUSAN KYLE,<br><br>Defendant. | CASE NO. 26-cr-189-SEH |

* * * * *

TRANSCRIPT OF PROCEEDINGS

MAY 28, 2026

BEFORE THE HONORABLE MARK T. STEELE

UNITED STATES MAGISTRATE JUDGE

**DETENTION HEARING**

* * * * *

Transcribed by Cheryl D. Rylant, CSR, RPR, FCRR

**APPEARANCES**

**FOR THE GOVERNMENT:**

TYSON JOHN McCOY
DOJ-USAO
110 West 7th Street
Suite 300
Tulsa, OK 74119
918.425.8362
tyson.mccoy@usdoj.gov

**FOR THE DEFENDANT:**

CHRISTINA HUNT
Federal Public Defender
Northern District of Oklahoma
One West Third, Suite 1225
Tulsa, OK 74103
918.581.7656
tina_hunt@fd.org

*************

**PROCEEDINGS:**

---------------------------------------------------------------

**THE DEPUTY COURT CLERK:** This is the *United States of America vs. Melisa Susan Kyle*, Case Number 26-cr-189-SEH.

Counsel, please enter your appearances.

**MR. McCOY:** Tyson McCoy on behalf of the Government.

**THE COURT:** Good morning.

**MS. HUNT:** Good morning, Your Honor. Christina Hunt on behalf of Ms. Kyle who's present in custody of the U.S. Marshals.

**THE COURT:** Good morning.

All right. The first matter before us is the unopposed motion for a detention hearing. As the motion is unopposed, that will be granted.

And, with that, we can proceed with the detention hearing.

And, ma'am, I will advise you that this -- the purpose of this hearing is to determine whether you'll be detained pending trial or whether you will be released on conditions.

I'll hear from the Government, please.

**MR. McCOY:** Yes, Your Honor.

As a preliminary matter, if I could ask the Court to take judicial notice of a couple of documents. One is the Pretrial Services Report. The second document would be the Complaint and Affidavit.

**THE COURT:** All right. Thank you.

**MR. McCOY:** Your Honor, may I call my first witness?

**THE COURT:** Yes.

**MR. McCOY:** Laura Dominguez.

**THE COURT:** You may.

**THE DEPUTY COURT CLERK:** Please raise your right hand.

*[Oath administered.]*

**THE DEPUTY COURT CLERK:** Thank you.

Please have a seat, and watch your step.

**LAURA DOMINGUEZ,**

having been duly sworn, testifies as follows:

**DIRECT EXAMINATION**

**BY MR. McCOY:**

*Q.* Ma'am, will you please state your first and last name for the record?

*A.* Laura Dominguez.

*Q.* And what is your occupation?

*A.* I'm a Special Agent with the Drug Enforcement Administration.

*Q.* And can you briefly describe your training and experience as it relates to investigating drug trafficking crimes and also, in particular, methamphetamine-related trafficking.

*A.* I attended the DEA training academy from February 2024 and

graduated in June of 2024.

Since then, I have been assigned to the Tulsa resident office, which is located in the Northern District of Oklahoma.

During my training at the academy, I received training regarding surveillance, undercover work, clandestine laboratories, as well as distribution, to include that of methamphetamine.

*Q.* Have you also been involved in the investigation of methamphetamine trafficking cases?

*A.* Yes, I have.

*Q.* Now, are you familiar with the case that we're here in court today, the *United States versus Ms. Melisa Kyle*?

*A.* Yes.

*Q.* And were you one of the investigators that responded to the scene of a traffic stop and drug seizure involving Ms. Kyle?

*A.* Yes.

*Q.* I want to take you back to May 10th of this year.

On that day, was Tulsa County Sheriff's Office Deputy Freddie Alaniz working on Interstate 44 traveling eastbound at around the twelve -- 1200 block of Interstate 44?

*A.* Yes.

*Q.* And is that location within the Northern District of Oklahoma?

*A.* Yes, it is.

*Q.* And at that location, or approximately at that location, did Deputy Alaniz observe a Mazda CX50 with a California license plate number 9NGC461 driving on the interstate?
*A.* Yes.
*Q.* And did he conduct a license plate reader check of the license plate for that vehicle?
*A.* Yes.
*Q.* And when he conducted that check, did he notice anything that was significant to him?
*A.* Yes. According to the Tulsa County report, he observed that the vehicle had traveled from Tulsa, Oklahoma, to California/Arizona border and back.
*Q.* And is Deputy Alaniz -- is he a narcotics canine officer with experience in drug interdiction?
*A.* Yes.
*Q.* After he came back with the license plate reader check of the Mazda, did he observe the vehicle make some traffic violations?
*A.* Yes. He observed a couple of lane-change violations, which would be that the driver failed to give a hundred feet after activating the turn signal prior -- prior to making the lane change.
*Q.* And did deputy -- Deputy Alaniz also observe the Mazda following too closely behind another vehicle?
*A.* Yes, he did.

*Q.* Okay. After observing those violations, did Deputy Alaniz then conduct a traffic stop of the Mazda?
*A.* Yes.
*Q.* And did he make contact with the driver of the Mazda?
*A.* Yes. According to the report and the body cam footage, he made a passenger-side approach to the vehicle.
*Q.* And who was the driver of the vehicle?
*A.* Melisa Kyle was the driver of the vehicle.
*Q.* And is that the Defendant in the charged case we're in court on today?
*A.* Yes.
*Q.* Were there any other occupants inside the vehicle?
*A.* No. She was the sole occupant.
*Q.* Did Deputy Alaniz engage in conversation with Ms. Kyle then at the passenger front door of the vehicle?
*A.* Yes.
*Q.* As he was talking with the Defendant, did he notice anything that was significant to him inside the vehicle?
*A.* Yes. According to the report, the deputy observed the backseats to be laid down, and he observed about four large suitcases and one smaller suitcase.
*Q.* While Deputy Alaniz was talking with Ms. Kyle, did she make any statements about her travels that was significant to Deputy Alaniz?
*A.* I believe, according to the report, she mentioned having

gone to California for a couple of days.
*Q.* Did Deputy Alaniz describe Ms. Kyle's demeanor as he was talking with her at the passenger door?
*A.* I believe, according to the report, he stated that he observed nervousness and her hands shaking while -- I believe she was retrieving her driver's license and trying to find her insurance.
*Q.* And so, during the course of this conversation on the side of the road, did Deputy Alaniz ask Ms. Kyle for her driver's license and her vehicle registration?
*A.* Yes.
*Q.* And did she provide her driver's license?
*A.* Yes, she did.
*Q.* Was she able to provide the vehicle registration?
*A.* No, she did not. I believe she stated that it was a rental vehicle.
*Q.* Did Deputy Alaniz then ask Ms. Kyle to accompany him to his patrol car while he conducted a records check?
*A.* Yes.
*Q.* And did they do that?
*A.* Yes.
*Q.* While Deputy Alaniz was running the records check, did Ms. Kyle make any further statements about her trip to California?
*A.* I believe, according to the report, she stated having gone

to California and was coming back from California. I believe she made a statement stating, "Like I said, I've been gone for six days."

*Q.* Did she have any difficulty recalling when she went to California?

*A.* She did. She could not identify what particular day she had left on her trip.

*Q.* Did Deputy Alaniz ask her about the luggage that was -- that he saw inside her vehicle?

*A.* Yes.

*Q.* And did she make any statements about the luggage?

*A.* She stated that she ends up buying a lot of stuff and ended up having to buy a suitcase so that it didn't look silly in Walmart bags.

*Q.* Did Ms. Kyle say -- say what she was doing in California?

*A.* She stated she was visiting with one of her cousins and stated having gone swimming and hanging out.

*Q.* Did Deputy Alaniz then give Ms. Kyle a warning for traffic violations?

*A.* Yes.

*Q.* Did he then ask her if he could ask -- or did Deputy Alaniz then ask Ms. Kyle if he could ask her some questions?

*A.* Yes.

*Q.* And did she respond in the affirmative?

*A.* Correct.

*Q.* Did Deputy Alaniz also inform Ms. Kyle that he was a drug interdiction officer and was familiar with drug trafficking activity?
*A.* Yes.
*Q.* And at that point, did he ask Ms. Alaniz *[sic]* for consent to search her vehicle?
*A.* He did.
*Q.* And what did Ms. Alaniz *[sic]* say?
*A.* Ms. Kyle denied --
*Q.* I'm sorry --
*A.* -- consent.
*Q.* -- Ms. Kyle. Okay.
**MS. HUNT:** I'm sorry, I didn't catch the witness's answer.
**THE COURT:** Can you repeat your answer, please?
**THE WITNESS:** Kyle denied consent.
*Q.* (By Mr. McCoy) Did Deputy Alaniz then advise her that he would be doing an exterior dog's open-air sniff of her vehicle using his canine?
*A.* Yes.
*Q.* Then she was detained at that point?
*A.* Yes.
*Q.* Did Deputy Alaniz then wait for responding officers to arrive for backup so he could do that open-air sniff?
*A.* Yes.

*Q.* After he told her that, did Ms. Kyle make any statements as it relates to marijuana?
*A.* According to the report, Kyle then said, "I know that I got marijuana in there."
*Q.* After Ms. Kyle made that statement, did Deputy Alaniz subsequently run his certified narcotics canine on the exterior of the Mazda?
*A.* Yes, he did.
*Q.* And did the canine alert to the odor of narcotics?
*A.* Yes.
*Q.* Did officers then conduct a search of Ms. Kyle's rental vehicle?
*A.* Yes.
*Q.* And what did they find inside the vehicle?
*A.* According to the report, whenever deputies opened one of the luggage bags, opened the zipper on the inside compartment, they located numerous large Ziplock bags containing a white crystal-like substance.
*Q.* And was there anything in particular about the packaging in the suitcase, based on your training and experience, that would be consistent with drug trafficking?
*A.* Based on the packaging of the crystal-like substance, through my training and experience, I'd say it is consistent with how drug traffickers, both drug trafficking organizations and transnational criminal organizations, package narcotics to

transport them across state lines.
*Q.* And in the suitcases that contained the white crystalline substance, were there dryer sheets?
*A.* Yes, there were.
*Q.* And is that a -- is that something that drug trafficking organizations use to conceal the smell of drugs?
*A.* Based on my training and experience, yes.
*Q.* Was the drugs that were located in the suitcases, were they subsequently weighed?
*A.* Yes.
*Q.* And what was the total package weight of that crystalline substance in the suitcases?
*A.* After the traffic stop, DEA took possession of the drugs. And once processed as DEA drug evidence, it weighed approximately 44,528.9 gross grams.
*Q.* Was that substance subsequently field tested to determine if it contained methamphetamine?
*A.* Yes. A couple of the bags were TruNarc field-tested, and they tested presumptively positive for methamphetamine.
**THE COURT:** Excuse me. Special Agent, can you give me the weight again?
**THE WITNESS:** 44,528.9 gross grams.
**THE COURT:** Thank you.
**MS. HUNT:** I'm sorry, Judge, I didn't --
**THE COURT:** 44,528.9 gross grams.

**MS. HUNT:** All right. Thank you, Judge.

*Q.* (By Mr. McCoy) In addition to the crystalline substance that was tested at 44,000-plus grams, what -- what else was located inside that vehicle as it relates to being contraband?

*A.* According to the report, they observed marijuana flower located in a brown paper bag, along with numerous marijuana vapes. They also located a -- additional marijuana flower in a plastic bag, a glass pipe wrapped in a pink bandana, a small glass jar containing a crystal-like substance, and an improvised smoking device that is commonly used to consume narcotics.

*Q.* Was there also cash located in the vehicle?

*A.* Yes. According to the report, the deputies located a black locked box, and they located four bundles of U.S. currency which were held by rubber bands.

*Q.* And what was the total amount of that U.S. currency?

*A.* According to the report, it was $7,000.

*Q.* And the -- the cash that was in the vehicle, the way it was banded and in the denominations that it was in, based on your training and experience, is that consistent with proceeds or money involved in drug trafficking?

*A.* Based on my training and experience, yes.

*Q.* Now, the 44,528 grams, are you able to give an -- an estimate of what the market value would be for that quantity of methamphetamine?

*A.* Based on my training and experience, as well as other investigations I have conducted, I'd say an ounce could go for approximately $250. Therefore, with it being approximately 44 kilos -- and there being about 35 ounces in a kilo. That would make a kilo about 8,750; therefore, the 44 kilos would come out to approximately $385,000.

*Q.* Based on your training and experience, given the quantity of the methamphetamine that was located in this case, did -- could that amount be distributed to hundreds of users of methamphetamine?

*A.* Based on my training and experience, yes.

*Q.* Did you also -- as part of the investigation in this case, did you and officers also seek -- or obtain the rental agreement records for the Mazda that Ms. Kyle was driving?

*A.* Yes, we did.

*Q.* And in those records, did it show the dates that Ms. Kyle had rented the Mazda?

*A.* Yes. Based on the records we received from Enterprise, there was an initial rental agreement that initiated on April 2nd of this year through May 4th of this year and was, what appeared to be, renewed on that same date. That was good through May 12th of this year.

*Q.* Okay. And did those records from the rental agreement starting on April 2nd, 2026, did they give an odometer reading for the Mazda when Ms. Kyle took possession of the vehicle?

*A.* Yes, it did.
*Q.* And what was that odometer reading?
*A.* The initial odometer reading was approximately 37,647 miles.
*Q.* And did the subpoena records also give an odometer reading on the 4th for the same Mazda vehicle that was rented to Ms. Kyle?
*A.* Yes.
*Q.* And what was that reading?
*A.* Approximately 50,706 miles.
*Q.* And then the stop in this instant case where the methamphetamine was located, that was on May 10th. Correct?
*A.* Correct.
*Q.* So, based on the records from Enterprise and the investigation in this case, it's fair to say, in addition to the approximately 13,000 miles from April 2nd to May 4th, there are the additional two, 3,000 miles for a roundtrip from the Oklahoma area to California --
*A.* Yes.
*Q.* -- would that be accurate?
Okay. So fair to say roughly around 15,000 miles in about a month and eight days on the vehicle?
*A.* I would say so.
*Q.* Okay. Based on your training and experience, is that kind of activity, that driving, the number of those miles, combined

with the other evidence in this case -- is that significant to you?
*A.* Yes. Based on my training and experience, I would say the mileage would be consistent with multiple trips.
*Q.* When you say "multiple trips," what do you mean?
*A.* Given the information that was provided in the report regarding LPR hits and her stating she had gone out to California, I would say she had made several trips out to California based on that information. And based on, again, my training and experience, we know there are sources of supply specifically for methamphetamine out in California.
*Q.* As part of your investigation, have any of -- other individuals who may be involved in the trafficking of methamphetamine that was located in the Mazda, has anyone else been identified, any other co-conspirators?
*A.* It's still an ongoing investigation --
*Q.* Has --
*A.* -- at this point.
*Q.* Has anyone been arrested?
*A.* Nobody else has been arrested at this time.
*Q.* Okay. Given the seizure of, you know, approximately 44,000 grams of methamphetamine, would that be a significant drug debt for the drugs that were seized from Ms. Kyle to a drug trafficking organization?
*A.* Based on my training and experience, yes.

*Q.* Okay.

**MR. McCOY:** Your Honor, I'm just about done. If I can have just one moment?

**THE COURT:** You may.

**MR. McCOY:** Your Honor, I have no further questions for this witness.

**THE COURT:** Thank you.

Cross examination?

**MS. HUNT:** Thank you, Your Honor.

**CROSS EXAMINATION**

**BY MS. HUNT:**

*Q.* Agent Dominguez, how long had you known -- have you been with the DEA?

*A.* I graduated in June of 2024, so approximately two years now.

*Q.* And before that time, were you in law enforcement?

*A.* I was a Spanish analytic linguist prior to that, working with law enforcement.

*Q.* Okay. And where was that?

*A.* Primarily out of the DEA Dallas division.

*Q.* Thank you.

So you've worked for the DA -- DEA a total of how long --

*A.* I --

*Q.* -- like as a --

*A.* -- I on-boarded with DEA in January of 2024. Prior to

that, I was a contractor. My company contracted with DEA.
*Q.* Okay. And how long were you a contractor for DEA?
*A.* Approximately 10 years.
*Q.* Oh. Thank you.
So I noticed you were looking down at some things while you were testifying. What were you looking at?
*A.* I was referencing the Tulsa County police report.
*Q.* May I see that, please?
*A.* You may.
*Q.* Thank you.
Are you the -- are you the main case agent? Are you the leading case agent on this case?
*A.* I'm a co-case agent.
*Q.* Okay. Who's your...
*A.* TFO Evan Foster.
*Q.* And the two of you, together, have responsibility, I take it, for investigating and following up in this case. Correct?
*A.* Yes, at this time.
*Q.* Now -- and I want to go back for just a minute.
You testified about your knowledge of drug trafficking organizations --
*A.* Yes.
*Q.* -- correct?
So you will agree with me that there are many levels of a drug trafficking organization. Correct?

*A.* Yes.
*Q.* So we have the -- the head of it. Correct?
*A.* Yes.
*Q.* Who has people working for him?
*A.* Yes.
*Q.* Who have people working for them?
*A.* Yes.
*Q.* Who have people working for them?
*A.* Yes.
*Q.* And one of the things that is common is that you have -- you -- you know what a mule is, don't you?
*A.* I am familiar with the word, yes.
*Q.* Okay. And a drug mule -- you're familiar with that term?
*A.* Yes.
*Q.* And that would be a person who isn't actually selling but is moving -- may not be actually selling but is moving drugs from one location to another. Correct?
*A.* Yes.
*Q.* And in this particular case, you don't actually know what role Ms. Kyle has in the drug trafficking organization, do you?
*A.* Based on my training and experience, I could say that there are transnational criminal organizations that utilize people to traffic drugs across state lines.
*Q.* So that -- that wasn't my question. And I don't think you understood my question.

You don't actually know what exact role Ms. Kyle played in this drug trafficking organization, do you?
*A.* Based on how much methamphetamine she was carrying, I believe she would be considered a courier --
*Q.* All right.
*A.* -- for the organization.
*Q.* So -- and that mean one level up from a mule. Correct?
*A.* I've never really utilized the word mule, so I'm not sure if I can answer that question.
*Q.* Well, let's -- let's break down what a courier is.
A courier would be someone who picked up drugs from one location and took it to another location. Correct?
*A.* I would say that's a fair ...
*Q.* Okay. And it's not necessarily true that a courier, other than taking it from one location to another location, is a person who's actually selling the drugs?
*A.* Based on my training and experience, a courier could be selling as well.
*Q.* Could be, but also could not be. Correct?
*A.* That's possible.
*Q.* Now, in this particular -- you -- you said you pulled a rental agreement --
*A.* Yes, I did.
*Q.* -- from Enterprise?
*A.* Yes.

*Q.* And did you note where the car was rented?

*A.* I believe the initial rental agreement stated it was rented out of Bullhead City, Arizona.

*Q.* Okay. Do you have a copy of that --

*A.* That was --

*Q.* -- rental --

*A.* -- provided through discovery.

*Q.* I asked if you had a copy of it.

*A.* I currently do not have a copy.

*Q.* And do you know where the car was picked up?

*A.* From the Enterprise rental agreement, I believe it stated Bullhead City, Arizona.

*Q.* I think my question to you was do you -- other than what the rental agreement says, do you have any personal knowledge of where the car was picked up?

*A.* Just what the rental agreement says.

*Q.* Okay. Now, in this particular case, Ms. Kyle was stopped for minor traffic violations. Is that right?

*A.* According to the Tulsa County report, yes.

*Q.* Okay. And those minor traffic relations were failure to use a turn signal --

*A.* Yes.

*Q.* -- properly. Correct?

*A.* Yes.

*Q.* And also following too closely?

*A.* Yes.
*Q.* And that was on Interstate I-44 in the Northern District of Oklahoma?
*A.* Correct.
*Q.* Now, when Ms. Kyle was pulled over, of course you were not there?
*A.* Correct.
*Q.* And you said that the officer -- Alaniz?
*A.* Yes.
*Q.* The sheriff's deputy?
*A.* Yes.
*Q.* Okay. He actually had his drug dog in her car. Is that right?
*A.* That is correct.
*Q.* Okay. When he went to talk to her, the first thing of course he told her was why he was pulling her over?
*A.* I believe that is correct.
*Q.* And he asked for her driver's license and the vehicle registration?
*A.* I believe so, yes.
*Q.* And the vehicle -- let -- let me ask you this. The -- because I'm not sure, or I didn't make a note of it.
The license tag on that car, it was a California license tag?
*A.* Yes.

*Q.* Okay. It is true that rental car companies -- and you can rent a car, for example, in Florida and it may have a tag from a completely different state. Right?
*A.* It may.
*Q.* Because of the way that the rental car companies sort of operate. Right?
*A.* Yes.
*Q.* And did -- excuse me.
Now, when offer -- Officer Alaniz looked at her driver's license, did he know where she lived?
*A.* I believe he noted in the report it was a Missouri license -- driver's license.
*Q.* Okay. Now, I wanted to ask you: When the car -- he first noticed the -- the -- the license plate and the car traveling eastbound, he actually, before he did anything else, conducted a license plate search on that car?
*A.* According to the report, yes.
*Q.* Okay. And then he -- he learned that -- because of that, the license plate reader search gave him information on where the car had traveled. Am I right?
*A.* According to the report, yes.
*Q.* And it wasn't until he observed all of those hits that he noted that, from his training and experience - right? - that often people who are transporting something illegal will make a short trip, short turnaround. Right?

*A.* I'd have to reference the report.

**MS. HUNT:** May I approach the witness, Your Honor?

**THE COURT:** You may.

**THE WITNESS:** Yes, according to the report.

*Q.* (By Ms. Hunt) And actually -- well, he actually -- the reason why he stopped the car was because of the blinker situation. Am I right?

*A.* It was a lane change violation.

*Q.* A lane change violation which involved a blinker?

*A.* Yes.

*Q.* Now, he also noticed that -- that was the first thing he noticed. And then he noticed that the car pulled in too closely behind another car. Right?

*A.* I believe he observed two lane change violations and then it was that the vehicle was too close to another vehicle, if I remember the report correctly.

*Q.* All right. And then, after that, he continued to follow the vehicle before he made the actual -- activated his lights and made the actual stop. Right?

*A.* According to the report.

*Q.* Okay. Now, when he identified himself to her and explained why he made the stop, he also told her that he was not going to write her a ticket for the violations?

*A.* I believe that is correct, according to the report.

*Q.* And at that point, she gave him her driver's license -

right? - her Missouri driver's license?
*A.* According to the report, yes.
*Q.* And then she said it was a rental car, that she wasn't sure where the rental agreement was. Am I right?
*A.* Correct.
*Q.* Now, during the search of the car, was the rental agreement found?
*A.* I do not recall reading about the rental agreement.
*Q.* I assume that, as the co-lead investigator in this case, of course you've pretty much at least looked at all of the reports. Right?
*A.* There -- as far as I know, it is the one Tulsa County report.
*Q.* Okay.
*A.* Two Tulsa County reports. I believe they're in -- in the same packet.
*Q.* Okay. And those are the only reports that you saw?
*A.* From Tulsa County.
*Q.* Right.
*A.* I believe so.
*Q.* All right. Now, did you look at police -- other police reports?
*A.* I don't believe there are any additional police reports regarding this traffic stop.
*Q.* Okay. Now, he asked her if perhaps there -- she couldn't

find the rental agreement. Right?
*A.* From what I --
*Q.* Was that --
*A.* -- recall, yes.
*Q.* Yeah.
And -- and the -- the trooper -- not trooper. The deputy asked her if perhaps it was in her phone?
*A.* According to the report, I believe he does ask her that.
*Q.* And then he asked her to come to his car. Correct?
*A.* Yes.
*Q.* And where he would be writing her a warning and she could look up the rental agreement?
*A.* That is accurate.
*Q.* He asked her then, while she was back at his car, if he could ask her some questions?
*A.* I believe so.
**THE COURT:** Counsel, I don't know where you're headed with all this, but this is a detention hearing.
**MS. HUNT:** I understand, Judge.
**THE COURT:** So what -- wherever you're going, get there.
**MS. HUNT:** All right. You know I'm slow, Judge, but I'll get -- I'll -- I will move faster.
*Q.* (By Ms. Hunt) When he asked if he could ask her some questions, he also informed her he was a drug interdiction

officer?

*A.* I believe that was later in their interaction, yes.

*Q.* Right.

And at -- at that point, actually, she wasn't free to leave, was she?

*A.* I believe he -- I don't recall if he stated that she was being detained at that point.

*Q.* So she was getting only a warning for a traffic violation. Correct?

*A.* Correct.

*Q.* She was being held there while that was all going on. Right?

*A.* Correct.

*Q.* She did tell -- when he said he was going to deploy his dog, drug dog, she told him there was marijuana in the car?

*A.* Correct.

*Q.* And I -- because I don't think I heard this. Where was the marijuana located?

*A.* I believe there was multiple places where the marijuana was found. I'd have to reference the report.

**THE COURT:** Counsel, please ask to approach.

**MS. HUNT:** Oh, I'm sorry. May I?

**THE COURT:** You may.

**THE WITNESS:** Thank you.

*Q.* (By Ms. Hunt) And -- and while you're looking at that,

could you tell me how much marijuana was found? I don't remember hearing that.

*A.* According to the report, there was a tan purse with an American flag on the front of it. The purse contained additional marijuana flower in a plastic bag, which contained a glass pipe wrapped in a pink bandana, a small glass jar containing a crystal-like substance, and an improvised smoking device that is commonly used to consume narcotics.

*Q.* Okay. And was marijuana found in any other location in the car?

*A.* During the search of the vehicle, according to the report, a piece of luggage in the back cargo area and -- and located multiple unused heat-seal bags and two marijuana vapes --

*Q.* So --

*A.* -- and continued to search the center console and --

*Q.* Excuse --

*A.* -- located --

*Q.* Excuse me.

There were unseal -- did you say there were unsealed heat bags or sealed heat bags?

*A.* The report states multiple unused heat-seal bags.

**THE COURT:** All right. Ms. Hunt, let's move on.

*Q.* (By Ms. Hunt) Was there anything --

**THE COURT:** Ms. Hunt, look, I get it. This is not a preliminary hearing. I get with the point you're trying to

make about the stop, but we are in a detention hearing, so let's move on.

**MS. HUNT:** All right.

*Q.* (By Ms. Hunt) The tan purse, where was it located?

**THE COURT:** Ms. Hunt, let's move on.

**MS. HUNT:** Your Honor --

**THE COURT:** I got it. Let's move on. This is --

**MS. HUNT:** May I --

**THE COURT:** No. This is a detention hearing. Let's get to the detention hearing. I -- I understand the point you're trying to make about the stop, but let's move on.

**MS. HUNT:** May I be heard, please?

**THE COURT:** You may.

**MS. HUNT:** Judge, the reason I'm asking the question about the marijuana is I want to know where the tan purse was. That was my next question.

**THE COURT:** All right. Go ahead, ask that question, and let's move on.

**MS. HUNT:** Done.

*Q.* (By Ms. Hunt) Where was the tan purse located, please?

*A.* According to the report, in the front passenger seat.

*Q.* Thank you.

And that would be next to where she was sitting?

*A.* Yes, next to the driver's seat.

*Q.* Thank you.

You said there was money found in a locked box?

*A.* According to the report, yes.

*Q.* And do you know -- you said the locked box was opened. Do you know if Ms. Kyle had a key?

*A.* I do not know that information.

*Q.* Do you know how the box was opened?

**THE COURT:** That's it. Ms. Hunt, move on from the stop. Move on from the stop. This doesn't have anything to do with detention. We are at a detention hearing, not a preliminary hearing. This isn't time for free discovery. We're here on a detention hearing. I've asked you three times to move on. Let's move on.

**MS. HUNT:** May I be heard, please?

**THE COURT:** You may.

**MS. HUNT:** Judge, the reason I'm asking that is: If Ms. Kyle had no access to the locked box - right? - that goes to the weight of the evidence against her, which is part of what the Court has to determine in a detention hearing.

**THE COURT:** I'll give you a couple more questions, then you -- let's move on.

*Q.* (By Ms. Hunt) You don't know how the locked box was opened?

*A.* I do not know.

*Q.* You do not know whether or not Ms. Kyle had a key to the lockbox?

*A.* I do not know.
*Q.* Do you know if the luggage was locked?
*A.* I'm not familiar with if they were locked or not.
*Q.* Now, as the case agent, do you know if further investigation, such as fingerprinting of the outside of the luggage or the packages that were in it were fingerprinted and Ms. Kyle's fingerprints found on anything?
*A.* Fingerprints were not ordered on the luggage bags.
*Q.* Thank you.

**MS. HUNT:** Judge, I'm fixing to make you happy by saying I don't have any further questions right now.

**THE COURT:** Very well.

Redirect?

**MR. McCOY:** No, Your Honor. Thank you.

**THE COURT:** All right. Thank you.

You may step down.

**THE WITNESS:** Thank you.

**THE COURT:** Does the Government have any additional evidence or proffer it would like to offer at this time?

**MR. McCOY:** No, Your Honor. Just argument.

**THE COURT:** All right. Ms. Hunt, we'll hear from you, please.

**MS. HUNT:** And, Your Honor, I would merely proffer the Pretrial Services Report.

I would also proffer a change of circumstances that

occurred since this case -- when Mr. Williams was last in court. Do you want --

**THE COURT:** Yes, please. I'd like to hear that.

**MS. HUNT:** Since -- oh, I need my glasses, Judge.

On the date May 18th that this -- when Ms. Kyle agreed to -- executed a waiver of detention, there was not a release plan approved by United States Probation. In between that time and then when we are in court today, an Indictment was returned. She was arraigned on that yesterday, just for the Court's knowledge.

Ms. Kyle has applied to the Catalyst drug treatment program. She was accepted in that. That is in Oklahoma City. That is a residential program that is contracted with U.S. Probation. It is a program that lasts 60 to 90 days inpatient, intensive inpatient treatment. And a bed is -- she applied, was accepted, and a bed is now available on May the 28th, which is tomorrow.

**THE COURT:** And this is in Oklahoma City. Correct?

**MS. HUNT:** Yes, Your Honor.

Given that, at the time she waived her detention, the issue of detention, we believe that the acceptance into the treatment program and now that Probation has gotten suitable housing information, which was not available to U.S. Probation prior to that time, that there are now conditions of release that will reasonably ensure her appearance and safety.

**THE COURT:** Upon release, what would the plan be?

**MS. HUNT:** Your Honor, she would live within the Northern District of Oklahoma, in Grove, Oklahoma, with a friend.

**THE COURT:** Do you know the name of the friend?

**MS. HUNT:** Judge, I do think that I know that. Just a moment. Your Honor, with Kerri Giddens (phonetic).

**THE COURT:** Terry or Kerri?

**MS. HUNT:** Kerri.

**THE COURT:** Kerri.

**MS. HUNT:** Kerri is a man.

And I believe that information was given to U.S. Probation.

**THE COURT:** Yes, I think you're correct.

**MS. HUNT:** Okay. Based on all of that, we believe -- I mean that's the proffer. I have argument to make, but I'll --

**THE COURT:** All right. Very well.

I'll hear from the Government with any argument, please.

**MR. McCOY:** Yes, Your Honor.

Your Honor, I'll go ahead and then just address the sentencing factors, in order, numerically, starting out with the nature of the offense. First, as a preliminary issue, this is a presumption case, given the charge, and there's a sentence, a minimum of 10 years.

Factor number (1), the nature of the offense. In this case, the offense involved an extremely large a lot of narcotics, approximately 44,000 grams of methamphetamine. The case agent testified that that could be distributed to hundreds of users, so that amount is -- could have extreme damage on the community. There was $7,000 in cash, consistent with drug trafficking. There's also evidence consistent with interstate trafficking going to source states such as California with over 15,000 miles driven on the vehicle over the course of about a month and -- a month and eight days. So there's evidence, in the totality, that Ms. Kyle was traversing the -- at least the western part of the United States to traffic large quantities of drugs. The drugs seized in this case were worth approximately $385,000, which is an extremely large amount of money.

Meth is extremely dangerous to the community. I'll get -- I'll get that -- into more in that on the next factor.

Moving to the weight of the evidence. The evidence in this case is very strong. She was the sole occupant of the vehicle. The methamphetamine was found inside her rental car. She admitted ownership of the suitcases. Inside the suitcases was the methamphetamine. And then there was other evidence consistent with trafficking, including the -- the dryer sheets that were found to disguise the smell of the drugs, the cash quantity and the denominations that were found in the vehicle.

In addition to the evidence in this case, the Government will be seeking to admit at trial Rule 404(b) evidence to show the prior conviction for drug distribution in 2016 by this defendant in Mount Vernon, Missouri.

So the weight of the evidence is extremely strong, and so I'd argue that weighs in favor of detention.

History and characteristics of the Defendant. As mentioned, the drug distribution prior from 2016 in Missouri. In 2022, although not major, she left the scene of a motor vehicle accident. That's not major but it does show she was willing to leave the scene of a crime.

She lives in Missouri. There's no real strong ties to Oklahoma. She's only going to be in treatment for 60 to 90 days, and then she's got to start her life here in Oklahoma with no employment, as noted in the Pretrial Services Report, very limited money. And the Government is also concerned that the cash that is noted that is in her possession is the proceeds of drug trafficking, as she has no employment. Although the Pretrial Services Report says she's supported by a trust, it doesn't document the amount of that trust or how much she gets distributed from the trust every month. She documents that her monthly expenses are $1,300. So I don't see how she's going to afford to live outside custody without involving herself in the distribution of illegal narcotics and continuing to do what she has done.

As it relates to number (4), nature and seriousness and the danger to the community, as noted, this is an extremely large quantity of methamphetamine. The Oklahoma department of the state notes that methamphetamine is involved in two out of three overdose deaths in 2000 -- either 2024 --

**MS. HUNT:** And, Your Honor, I'm going to object to that. There's been no testimony as to that.

**THE COURT:** Response?

**MR. McCOY:** Your Honor, I -- evidence is closed. I could offer it as an offer of proof --

**THE COURT:** No. It's sustained.

**MR. McCOY:** -- I could offer it --

**THE COURT:** I sustained the objection.

**MR. McCOY:** Okay. Outside -- disregarding that statistic, methamphetamine is extremely dangerous, not only could this quantity -- could this quantity of methamphetamine be distributed to hundreds of users, the correlating activities of it, the drug trafficking organization, the crimes that go along with methamphetamine use and distribution are extremely dangerous to the community.

**MS. HUNT:** And -- and, again, Your Honor, I'm going to object to that because there was no evidence as to that.

**THE COURT:** Sustained.

**MR. McCOY:** In addition, if she was released, the co-conspirators, as testified to by the witness, are at large.

So she could easily reconnect with the co-conspirators and revolve herself in the --

**MS. HUNT:** And --

**MR. McCOY:** -- drug trafficking.

**MS. HUNT:** -- I'm going to object. The discussion about co-conspirators were none have been identified.

**THE COURT:** Sustained.

**MR. McCOY:** Your Honor, I would argue it's a reasonable inference. That amount of drugs, going to different states and moving, there's a reasonable inference that other individuals are involved.

And so I think there's a reasonable -- there's -- she -- -- there is a reasonable inference she has access to other individuals involved in this type of distribution. There was testimony that -- the witness said that, based on her experience, that this type of activity is consistent with drug trafficking organizations.

Given her limited financial resources, the -- her lack of ties to this state, and her inability to make income as demonstrated in the Pretrial Services Report, at least legally, I think there's -- it's very likely that -- of her inability to survive and succeed lawfully in the Northern District of Oklahoma.

**THE COURT:** Counsel, let me interrupt you right there.

**MR. McCOY:** Yes.

**THE COURT:** In looking at your motion, you said eligibility case drug offense with a maximum sentence of 10 years or more, and then you checked off serious risk defendant will flee. And then, under reason for detention, defendant's appearance is required.

Are you guys still sticking with that position?

**MR. McCOY:** That's how -- appearance is required is not. It's public -- primarily public safety, Your Honor.

**THE COURT:** All right. So we can -- we can eliminate that from the motion?

**MR. McCOY:** I still would argue, and here's why, Your Honor, if I could have just a little bit of leeway.

Given how mobile she has been and the access to money that she has, it's -- $385,000 of drugs is a lot. Given she's facing a significant time in custody and also she has no ties to this district, I think there's a reasonable argument that she could go outside the district and go in other locations. And so I think that that's still -- that's still (indiscernible).

**THE COURT:** Okay.

**MR. McCOY:** But I will reiterate it's primarily safety of the community, given the nature of what she is involved in, given that she has done this before. She was convicted of drug distribution in -- a charge in 2016.

And that the fact that she is now -- the change of circumstances articulated by Ms. Hunt is that there's now a program for her and it's about 60 to 90 days. That's a fairly short period of time for her to be in a stable environment before now she goes to a different state with minimal ties. And there's very little evidence to support she can sustain herself here in Oklahoma and even if she went back to Missouri lawfully.

And so, for all those reasons, Your Honor, the Government would ask that she be detained.

**THE COURT:** Thank you very much.

Ms. Hunt?

**MS. HUNT:** Your Honor, one of the things that the Government noted in their argument was the way in which the suitcases and the methamphetamine was packaged, that it was in bags, that there were dryer sheets in the bags, that it was packaged as if for distribution. But, Judge, when they start talking about how much money could be made off of this, $385,000 -- at least that's what the Government said -- they did that by calculating what the cost per ounce would be. The packaging was not in ounce packaging, so it had not been cut into smaller amounts that could lead to that. And as this Court is well aware, when drug trafficking organizations move drugs from one location to another location, and as the agent testified, there are layers of people who distribute the

methamphetamine, lower trip -- quantities, down to smaller quantities, down to smaller quantities. So that $385,000, Your Honor, is based on a dosage and is not based on -- nor was there any evidence connecting that Ms. Kyle would be the recipient of $385,000.

In addition to that, Your Honor, they claim that the money found in the lockbox indicated that that was her money and that's what she must have been making. However, the evidence also showed that no evidence --

**THE COURT:** Uh-huh.

**MS. HUNT:** -- that she had a key, no evidence that she had access. The box was locked.

And in terms of danger to the community, I'm -- of course every charge like this passes on a danger to the community, but that's not really the question. The question is: Are there conditions of release that can ensure her safety and have we overcome the rebuttal presumption, which you -- you only do by a small amount of evidence to suggest that those conditions are appropriate.

In this particular case, Judge, I would tell you that danger to the community - right? - and her ability to -- as -- as Mr. McCoy said, move around at will, is easily taken care of with an ankle monitor or GPS location monitoring. In addition to that, she would be in the Catalyst drug program for 60 to 90 days. So we know that, at least for three months, Judge,

she's going to be receiving not only treatment that she needs and is willing to take care of but she'll be in a facility where Probation can keep up with her and know exactly where she is.

After that, Your Honor, although the Government claims that, you know, we don't have any information about how she's going to make money, the Pretrial Services Report states that she gets money - right? - from her mother's trust. And that was verified, I believe, information.

**THE COURT:** And, Counsel, I'll tell you the -- the -- I think, based on what I've heard and comments from the Government, flight risk is not an issue here. I think this just comes down to danger to the community.

**MS. HUNT:** Well, sure.

I think the -- and -- and I think the Government's concern as to danger to the community is that she will continue in this business, at least that's what I'm hearing from the arguments of the Government. I say that there are conditions which this Court can set to ensure that those things don't happen. One of those is monitoring where she is. The Government is arguing that she can move state to state, go anywhere she wants to continue in this business. And additionally, Judge, when we're talking about danger to the community, the Government presented no clear evidence that she could be anything more than a courier. There was no evidence shown to the Court that she was

distributing, you know, to people within the community. There was no evidence shown that she was selling methamphetamine. And, in fact, the only thing they actually found in the car, which was in a tan purse in the driver's seat next to her, was the marijuana that she had admitted to when told the drug dog was going to roll around.

This Court can put her on conditions of release, supervision with a U.S. Probation Officer, send her to treatment for 60 to 90 days, and require her to successfully complete that treatment, allow her to remain at miss -- Mr. Giddens' house in Grove, Oklahoma, in the Northern District of Oklahoma, and still with GPS monitoring and under house arrest so that we know where she is. She has a way to support herself, despite what the Government believes, because there is a trust fund for which she receives money.

So, with all of those conditions in place, Judge, as well as after the treatment, random drug testing, supervised visits by U.S. Probation, unannounced home visits by U.S. Probation, knowing where she is by GPS monitoring, and all of the other conditions this Court ordinarily will set on these kind of cases, I believe that, in this particular case, there are conditions that could be set to allow her to be released to treatment and then Mr. Giddens.

**THE COURT:** Thank you.

Response?

**MR. McCOY:** Judge -- Your Honor, as it relates to being involved in illicit activity if let out, she's had no employment as the Pretrial Services Report notes since 2023. The fact that -- if she's put on a monitor at a location, it doesn't prevent her from having communications with illicit organizations to further activity. And so I think there's still a concern, even if she was confined to a location, that she can be involved in activity.

And then just following back to the public safety, she has done this before as noted. That did not stop her. She has engaged in now an extreme quantity of methamphetamine distribution and that's extremely dangerous to the community, and I would argue that it's -- it warrants detention.

Thank you, Your Honor.

**THE COURT:** Thank you.

I'll give you the last word.

**MS. HUNT:** First of all, Judge, in terms of the Government finding that, you know, she's done this before, I do note the 2016 conviction. There was a guilty plea. Distribution of and the manufacture of a controlled substance, Count 2 possess up to 35 grams of marijuana, those being felonies. She had five years probation. She successfully completed the probation, so we know that she can follow rules and conditions.

Secondly, Judge, the -- in terms of being able to perhaps

contact people that she shouldn't be contacting, of course the Government hasn't told us who she shouldn't be contacting, just some vague nebulous people out there. And in addition to that, Your Honor, they -- I mean what good is she going to be to that organization, given that she is confined to her home with a GPS monitor or in treatment with a GPS monitor? So she certainly can't do courier work. She wouldn't be able to do distribution work. I don't know exactly what they think she is able to do.

Judge, so I think that's kind of a specious argument.

**THE COURT:** Thank you.

All right. Pursuant to Title 18 United States Code Section 3142(e)(3), there is a rebuttable presumption that, one, there is no condition or combination of conditions that will reasonably assure the appearance of the Defendant as required, and, 2, there is no condition or combination of conditions that will reasonably ensure the safety of any other person in the community.

The question now becomes whether the Defendant has presented some credible evidence to rebut the presumption.

With respect to appearance, flight risk, I think the Defendant has successfully rebutted the presumption and I think the Defendant -- or the Government has failed to meet its burden. So, on that basis, I do not find that the Government has sufficiently shown that the Defendant is a flight risk. However, I do not believe that the Defendant has successfully

rebutted the presumption that there is a combination of conditions that would reasonably assure the safety of any other person or the community, and, therefore, the Defendant will be detained pending trial.

Is there anything further from the Government?

**MR. McCOY:** No, Your Honor. Thank you.

**THE COURT:** Anything further from the Defendant?

**MS. HUNT:** No, Your Honor.

**THE COURT:** Thank you very much.

And with that, we're adjourned.

(End of recording.)

**REPORTER'S CERTIFICATION.**

While not present to stenographically report the foregoing proceedings, I certify that it was transcribed to the best of my ability from a digital audio recording. I further certify that I have no interest in the proceedings.

In witness whereof, I have hereunto set my hand this 26th day of June, 2026.

CERTIFIED: /s/Cheryl D. Rylant

Cheryl D. Rylant, CSR, RPR, FCRR
United States Court Reporter
333 W. 4th Street, #4-548
Tulsa, OK 74103
(918) 699-4877
cheryl_rylant@oknd.uscourts.gov