# Flock Safety Crosses 100,000 Cameras as 53 Cities Cancel Over Unauthorized Federal Data Access

*A national lookup setting in Flock contracts silently routed plate data to federal agencies.*

By Mireya Ramsey

Published: Jun 29 2026, 3:20 PM EDT

Exhibit 13



A surveillance camera is seen next to Commerzbank's logo on the Commerzbank building in the banking district in Frankfurt am Main, western Germany, on June 16, 2026. Tuesday, June 16, marks the final day for UniCredit's hostile and highly political takeover offer for Commerzbank, as Italy's second-largest bank has its sights on an ambitious pan-European banking merger. ( (PHOTO: KIRILL KUDRYAVTSEV/GETTY IMAGES)

In Dayton, Ohio, city workers spent weeks pulling black garbage bags over 72 surveillance cameras bolted to utility poles across town — a low-tech, almost accidental symbol for a very modern failure of accountability. Dayton wanted to stop Flock Safety's license plate readers from collecting data, but couldn't immediately exit its own contract, so it covered the lenses instead.

The image stuck. As of today, Flock Safety's network of artificial intelligence-powered cameras has crossed **100,000 units deployed across the United States** — more than at any point in the company's history — even as more than 53 municipalities across 20 states have terminated or rejected contracts with the Atlanta-based company, citing data-sharing violations, unauthorized federal access, and a pattern of surveillance settings that operated well beyond what cities were told they had signed up for.

What the growing legal record now shows — and what the draft contracts, city audits, class action filings, and court opinions of the past 18 months have forced into public view — is that the fundamental problem is not a rogue employee or a misconfigured camera. It is the network architecture itself. Flock's cameras connect via cellular to a cloud database accessible through configurable "national lookup" and "statewide lookup" permission toggles. When those toggles are on

designed, is constitutionally permissible.

## How Flock's Network Actually Works: The Architecture Cities Didn't Fully Understand

Flock Safety's pitch was straightforward: mount solar-powered cameras at intersections, use AI-powered optical character recognition to scan every passing license plate, and give local police a searchable cloud database to track stolen vehicles and investigate crimes. Each camera runs a modified version of Android, connects wirelessly to Flock's servers via LTE, and processes captured images using computer vision to extract not just plate numbers but a full "vehicle fingerprint" — make, model, color, body style, bumper stickers, roof racks, and visible damage — at capture speeds of up to 100 miles per hour. Officers can search the resulting database using natural language through Flock's FreeForm system, typing queries like "blue pickup truck with a kayak in the bed" and receiving matching footage from across the network.

What many cities didn't fully grasp when they signed up — sometimes after a free trial, sometimes after a pitch about solving car thefts — is that the system was never purely local. By default, many contracts enabled the **national lookup feature**, which allows law enforcement agencies anywhere in the country to query the data a specific city collected. The more cities joined, the more useful and the more expansive the shared network became.

Flock's own terms and conditions state that the company may access, use, preserve, or disclose plate data if it has "a good faith belief that such access...is reasonably necessary to comply with a legal process." It was that language — noted publicly by officials in Hillsborough, North Carolina, who terminated their contract — that clarified what many cities had not absorbed when signing: data "owned" by a municipality was never fully within its control.

## What City Audits Found: Six Cases That Defined the Scandal

**Dayton, Ohio.** In May 2026, an audit revealed that data from Dayton's cameras had been searched more than 7,100 times for immigration enforcement purposes — searches explicitly prohibited under the city's own policy, which barred using Flock data for immigration enforcement or sharing with agencies whose primary purpose was enforcing immigration law. City officials called the violations "egregious." Unable to immediately remove the cameras due to contract complications, they covered all 72 with trash bags.

**Mountain View, California.** An **ACLU-supported investigation** found that a statewide lookup setting had been active on 29 of the city's 30 Flock cameras since installation, unbeknownst to the police department. Over 12 months ending December 2025, more than 250 agencies that had never signed a data-sharing agreement with Mountain View conducted an estimated 600,000 unauthorized searches of the city's plate data. A separate national lookup setting on one camera had also been toggled on without the city's knowledge — and Flock kept no records from that period, making it impossible to determine what left the system or where it went. The ATF, the Air Force, and the GSA Inspector General were among the agencies found to have accessed the data. The city council voted unanimously to terminate the contract.

federal and out-of-state agencies — 299 improper inquiries over approximately one year. Upon discovery, SFPD turned off that access and opened an internal review. A **class action lawsuit filed in San Francisco Superior Court** in February 2026 alleges that out-of-state and federal agencies — including ICE, CBP, the FBI, and the ATF — had queried the city's cameras more than 1.6 million times in just seven months. California's ALPR Privacy Act explicitly prohibits sharing plate data with federal or out-of-state agencies without case-by-case authorization. The lawsuit seeks $2,500 per violation — exposure, across 1.6 million queries, in the billions.

**Illinois.** A state audit — triggered after Texas police used Illinois ALPR data to track a woman who had received abortion care in the state — found that Flock had allowed U.S. Customs and Border Protection to access Illinois cameras through an undisclosed pilot program. Flock stated its own leadership was unaware of the program. The audit found 47 agencies had to be removed from access. Illinois law explicitly prohibits sharing plate data for immigration or abortion-related investigations. Evanston terminated its contract and deactivated 19 cameras; Oak Park did the same.

**Evanston's sequel.** When Evanston canceled in August 2025 and ordered Flock to remove its cameras, the city later discovered that only some cameras had been taken down — and that Flock had reinstalled others without the city's permission, leaving them actively collecting data. Evanston sent a cease-and-desist. The cameras were not fully removed until early 2026.

**Oxnard, California.** Despite the city setting access to "California only," a vendor-based issue silently re-enabled a nationwide query feature, giving outside agencies access without the department's knowledge or approval. Oxnard suspended its program entirely.

## "Flock Nova": From Plate Readers to People Files

The documented violations do not represent the outer boundary of what Flock's system is designed to do. Internal documents, Slack messages, and meeting audio obtained by **404 Media** in 2025 revealed the company is building a product called Nova — described internally as a tool that would connect Flock's plate data with commercial data brokers offering people-lookup services, enabling police to "jump from LPR to person." Internal documents described Nova as drawing on 20 different data sources. Flock later said it would not include breach data after the reporting became public.

The **ACLU characterized the Nova disclosure** as making explicit what had always been implicit: Flock's longstanding claim that its cameras don't collect personally identifiable information was inaccurate, since license plates can be matched to registered owners via DMV databases. "With their new product," the ACLU wrote, "they make that falsity explicit, boasting that the new product will let police 'jump from LPR to person.'" EFF's Matthew Guariglia called it "precisely the kind of dystopian panopticon we've warned about."

Flock's AI capabilities are also expanding beyond still images. The company's cameras now deliver video clips and live feeds to law enforcement, with AI-driven natural language search enabling officers to scan footage for descriptions of vehicles and, potentially, their occupants — a capability the ACLU notes could encompass anyone in the camera's field of view.

## Security Vulnerabilities Researchers Found — and Flock Refused to Fix

Flock Safety's cameras have been physically and digitally exploited in ways the company has been slow to acknowledge and unwilling to fund a formal bug bounty program to address.

Musician and engineer Benn Jordan, working with researcher John Gaines, demonstrated in November 2025 that with physical access to a roadside Flock camera, they could press a single button, connect over Wi-Fi, use standard **Android developer tools** to debug the device, gain root access, and install malware. Exposed USB ports presented additional attack vectors. These are not sophisticated exploits requiring state-level capabilities; they are techniques any determined hobbyist could replicate.

In December 2025, **404 Media reporting** confirmed that at least 60 of Flock's Condor cameras — the company's pan-tilt-zoom units that automatically zoom in on people's faces as they walk through parking lots and public spaces — were fully exposed to the open internet and indexable through commercial search engines. No authentication was required. Live footage was accessible. Jordan demonstrated the exposure by recording Flock's dismissive response to his earlier work directly onto one of the exposed Condor cameras and downloading the clip.

Flock's response to the Jordan disclosures was to characterize security researchers as part of groups seeking to "defund the police, weaken public safety, and normalize lawlessness" — a posture that has not been replaced by a bug bounty program or a public disclosure policy. In June 2026, Flock announced an engagement with Bishop Fox for a cybersecurity assessment but has not committed to making findings public.

Independent surveillance research firm IPVM found an approximately 10% error rate in Flock's Falcon camera system in a 2021 study. Flock disputed the findings and halted sales to IPVM. Investigative reporting by Forbes found that Flock's widely cited 80% reduction in residential burglaries in San Marino, California corresponded to a period when burglaries slightly increased. Wrongful arrests stemming from misreads are documented in multiple jurisdictions. In the most widely cited case, a Black family with four children was held at gunpoint in Aurora, Colorado after an ALPR error. Flock employees were also found to have used footage of children at a youth gymnastics and aquatics center in Atlanta as a sales demo — showing police departments the cameras' capabilities using footage of minors — until 2026.

## What the Courts Have Not Yet Decided: Whether the Network Architecture Itself Is Constitutional

The legal cases mounting against Flock represent two distinct theories of liability, and only one of them has clear answers.

The first — that documented violations of data-sharing laws create statutory liability — is being tested in California class action litigation seeking $2,500 per violation. The February 2026 SF class action and at least four additional California cases target both Flock and private businesses that deployed cameras without compliant privacy disclosures. A separate Home Depot class action alleges that parking lot cameras operated by Flock amount to unlawful commercial surveillance of customers.

The second, more fundamental theory — that Flock's national lookup architecture is constitutionally impermissible even when used exactly as designed — remains unsettled. Courts have begun to split on it.

In January 2026, a federal district court in **Schmidt v. City of Norfolk** upheld Norfolk's Flock program, ruling that photographing a license plate on a public road does not constitute a Fourth Amendment search given the limited scale of the deployment. The ruling was explicit that the constitutional calculus could shift as camera density increases — the

The Washington Court of Appeals, in State v. Simonson decided the same week, reached a similar result, holding that a single Flock image on a public roadway does not implicate constitutional privacy protections.

Civil liberties organizations point to a different precedent. The Supreme Court held in Carpenter v. United States (2018) that acquiring seven days of historical cell-site location information constitutes a Fourth Amendment search because of the "detailed, encyclopedic, and effortlessly compiled" nature of the data. The mosaic theory — holding that individual observations, each innocuous on its own, can aggregate into a constitutionally significant picture of a person's life — is the legal framework the **ACLU pressed in its April 2026 amicus brief** to the Fourth Circuit. A system that logs every vehicle movement across a metropolitan area reveals where a person sleeps, worships, which doctor they visit, and which political rallies they attend — and that aggregated picture, the ACLU argues, is precisely what the Fourth Amendment's warrant requirement was designed to protect against.

The Institute for Justice's attorney Michael Soyfer stated after the Norfolk ruling: "The government cannot monitor someone's daily movements without a warrant based on probable cause, which is why we'll appeal today's decision."

Flock argues that its cameras produce discrete, point-in-time observations, not continuous tracking — and that courts have consistently rejected the analogy to GPS tracking or cell-phone data. The company also notes that deployment details matter: a 176-camera city and a 4-camera rural deployment are not the same constitutional question.

The Supreme Court has not yet decided an ALPR case. Until it does, the legal status of Flock's national network architecture depends on which circuit you live in, how many cameras your city has deployed, and what the next audit finds in the logs.

## Why 53 Cities Left — and Why 800 More Signed Up in 2026

The reasons cities have canceled contracts cluster around three themes: immigration enforcement fears, unauthorized federal access, and a collapse of trust in Flock as a data steward.

The Trump administration's immigration enforcement push was the accelerant. Sanctuary cities that had approved Flock contracts years earlier — primarily to recover stolen vehicles — suddenly found themselves holding contracts that made their sanctuary policies effectively unenforceable. As one Santa Cruz council member put it after the city voted to cancel in January 2026: "We should in no way consciously be in this system at all — just no way."

Flock CEO Garrett Langley pushed back against the cancellation wave, characterizing the opposition as "coordinated attacks" from groups seeking to "defund the police, weaken public safety, and normalize lawlessness." That framing backfired with at least one client: Staunton, Virginia Police Chief Jim Williams wrote back to Langley saying the criticism

Flock's official position is that data control rests with local agencies. "Agencies and cities are very much able to use this technology in a way that complies with their values," spokesperson Holly Beilin told Stateline. The company has pointed to crime-solving wins — including identifying the Brown University shooting suspect within hours — as evidence of the system's value. Flock denies direct contracts with ICE.

A Center of Democracy and Technology analyst offered a different diagnosis: "It was only once they saw ICE officials or CBP officials in their own communities that they realized that this data was leaking out from their immediate jurisdiction."

Meanwhile, nearly 800 U.S. cities approved new Flock contracts in 2026 alone. Flock says new partnerships significantly outpace departures. The network now has more cameras than at any point in its history.

Legislative responses are multiplying. Colorado passed SB 26-070 requiring warrants before sharing ALPR data with federal agencies. Washington's SB 6002, the Driver Privacy Act, imposes similar restrictions. Kentucky's HB 58 caps data retention at 90 days — the first state-level retention limit of its kind. Maine passed a comprehensive ALPR privacy law. In May 2026, the ACLU supported a bipartisan amendment to a federal highway funding bill that would have blocked ALPR cameras except for tolling purposes — it did not pass, but represented the most direct federal legislative challenge to the technology to date.

## What Residents Can Do Right Now

The practical exposure for any driver in a Flock-equipped city is real and present. Every pass through a camera logs your plate, make, model, color, and location. That data, stored for 30 days by default, has reached federal agencies in at least six documented jurisdictions despite city-level prohibitions — not because agencies forced their way in, but because a lookup setting was on.

File a public records request with your city's police department asking for all contracts with Flock Safety, data-sharing agreements, and audit logs of agency searches of your city's ALPR data. Check **deflock.org**, which has catalogued the locations of over 90,000 ALPR cameras nationwide. Contact your state legislator — California, Illinois, Washington, Colorado, Kentucky, and Maine have enacted or recently strengthened ALPR-specific restrictions. If you are in California, the ALPR Privacy Act (Civil Code §§ 1798.90.5–1798.90.55) entitles you to know how your data is being shared and used, and carries a $2,500 per-violation statutory damages provision that has now produced at least five class actions.

Dayton's trash bags will eventually come down. The cameras will be removed or replaced. But the broader question — whether any city can use Flock's network without its data eventually reaching agencies it never authorized — is one that courts, legislators, and the 53 cities that have already voted with their contracts are forcing into the open.

---

## Frequently Asked Questions

**Are Flock Safety cameras legal under the Fourth Amendment?**

Courts have split on the question. Two rulings in January 2026 — Schmidt v. City of Norfolk and State v. Simonson — upheld limited Flock deployments as constitutional, with both courts emphasizing that the scale and retention period of a specific deployment matter to the analysis. The Institute for Justice is appealing the Norfolk ruling. The ACLU argues in a pending Fourth Circuit case that pervasive ALPR surveillance violates the Fourth Amendment's protections under the same mosaic theory the Supreme Court applied to cell-phone location data in Carpenter v. United States (2018). The

present different legal profiles in different cities.

**How did ICE and federal agencies access local Flock camera data?**

Primarily through a "national lookup" or "statewide lookup" feature embedded in Flock contracts that allowed any participating law enforcement agency to query any other agency's camera data. In many cities, this setting was enabled by default or, as in Mountain View, activated without the city's knowledge. Federal agencies — including ICE, CBP, the FBI, and the ATF — accessed local data through data-sharing agreements with local police departments, or directly through the shared network when national lookup was active. Flock does not hold a direct contract with ICE, but that distinction provided no protection in cities where the lookup settings were open.

**Does your city have a Flock contract, and how can you find out?**

File a public records request with your city's police department or city clerk asking for any contracts with Flock Safety, data-sharing agreements, and audit logs showing which external agencies have searched your city's ALPR data. You can also check [deflock.org](deflock.org), which has mapped the locations of over 90,000 ALPR cameras across the country using crowdsourced data.

**What is Flock Nova, and why does it concern privacy advocates?**

Nova is a Flock product under development — already in early access with some law enforcement agencies — that links license plate scan data with commercial people-lookup data brokers, enabling officers to move from a vehicle sighting to a specific individual's identity, social connections, and associates. The ACLU notes this directly contradicts Flock's longstanding public claim that its cameras do not collect personally identifiable information. The EFF described Nova as a surveillance panopticon. After 404 Media published internal Flock documents describing Nova, the company said it would remove data breach sources from the product, but did not cancel it.

*ⓒ 2026 TECHTIMES.com All rights reserved. Do not reproduce without permission.*

**Tech Times**

Find the latest tech news!

Enter your email Subscribe

**PROMOTED CONTENT**

mgid



**Flip This Switch: Next Month Your Electric Bill Won't Be $245 But $14**

StopWatt




**Who Charges the Least for Car Insurance In Georgia? (Check Zip Codes)**



**Just Add 1 Drop Of This Household Item To Any Dark Spot and Wait 3 Minutes**

Gundry MD


Electricians: The Mistake That Doubles Your Electricity Bill
StopWatt


CVS Hides This $1 Generic Viagra-Here's The Aisle It's Really In
Friday Plans


Do This Daily And Fungus Will Be Gone In A Week
Bare Feet

## MOST POPULAR

1.  Apple Back to School 2026 Arrives This Week: Free Accessories After $200 Mac Hike

2.  X Money Goes Live for Premium Users: 6% APY, Visa Card, and Zero Bank Account Required

3. 

Gemini 3.5 Pro Cleared for July Launch as Fable 5 Nears Return, GPT-5.6 Stays Locked

4.  Hezbollah Drone Factory, Airstrike-Proof at 29 Meters, Demolished by IDF Ground Forces



Tech Times

Find the latest tech news!

E Subscribe





© 2026 Tech Times Media Inc. All rights reserved.